UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

————————————————————X

MARLA SHAPIRO and SAADIA SHAPIRO,

        Plaintiffs,

                                      **MEMORANDUM AND ORDER**
   v.                                    **05-CV-5114 (NGG)(MDG)**

PRIME MOVING & STORAGE, INC.,

        Defendant.

————————————————————X

GARAUFIS, United States District Judge.

    In this civil action, Marla and Saadia Shapiro ("Plaintiffs") allege that the above-captioned Defendant failed to carefully transport, store, and deliver their household goods and is therefore liable for breach of contract and other state law claims.[1] Defendant moves for summary judgment, arguing that Plaintiffs agreed to limit Defendant's liability in a manner that was proper under the Interstate Commerce Act. For the reasons set forth below, Defendant's motion is denied.[2]

———————————————

[1] Plaintiff Marla Shapiro originally filed this action in New York State Supreme Court. Defendant subsequently removed to this court. On August 1, 2006, this court granted Defendant's motion, on consent, to add Saadia Shapiro as a plaintiff pursuant to Fed. R. Civ. P. 19(a)(2)(ii). The Plaintiffs did not, however, file an amended complaint reflecting the joinder of Saadia Shapiro as a plaintiff.

[2] This court possesses federal question jurisdiction over the instant action because the Carmack Amendment governs interstate shipments of goods: "A carrier providing transportation or service subject to jurisdiction . . . shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier . . . [is] liable to the person entitled to recover under the receipt or bill of lading." 49 U.S.C. § 14706; see Cleveland v. Beltman North Am. Co., 30 F.3d 373 (2d Cir. 1994) (married couple's claim against movers for damage to household belongings that occurred during interstate move arose under Carmack Amendment); Philips Consumer Elec. Co. v. Arrow Carrier Corp., 785 F. Supp. 436, 440 (S.D.N.Y. 1992), aff'd in unpublished order, 999 F.2d 537 (2d Cir. 1999) ("[T]he Carmack Amendment to the Interstate

## I.    Factual Background

Before setting forth the relevant facts, I note that when deciding a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995). Even in a fact-intensive case, however, the court will not accept as fact mere allegations lacking evidentiary support. Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001).

Plaintiffs Marla and Saadia Shapiro are a married couple and are both practicing attorneys. (Affirmation of Joseph H. Neiman ("Neiman Aff.") Exh. D, Marla Shapiro Deposition ("Marla Dep.") at 6; Neiman Aff. Exh. E, Saadia Shapiro Deposition ("Saadia Dep.") at 6.) In late 2004, one or both Plaintiffs retained Defendant to move some of their household belongings from their home in Brooklyn, New York to a storage facility, maintain the property in storage for some period of time, and then move the property from the storage facility to their new home in Englewood, New Jersey. (Defendant's Rule 56.1 Statement ("Def. 56.1 St.") ¶ 2; Plaintiff's Rule 56.1 Statement ("Pl. 56.1 St.") ¶ 2; Marla Dep. at 12:1-6.)

Plaintiffs' friends recommended Defendant to Plaintiffs. (Marla Dep. at 12:10-13:7.) At some point between September and November 2004 Marla telephoned Defendant and discussed arrangements for the move. (Id. at 10:9-11:4, 13:5-14:20.) Marla and Defendant's employee(s) had subsequent communications, including a visit by Defendant's employee(s) to Plaintiffs'

---

Commerce Act, 49 U.S.C.A. § 11707 (1991 Rev. Supp.), [ ] governs cargo loss and damage by regulated interstate motor carriers."); see also Ideal Steel Supply Corp. v. Jan Trucking & Rigging, Inc., No. 04-cv-1196 (TCP), 2006 WL 1120608, at *3 (E.D.N.Y. Apr. 26, 2006).

Brooklyn home. (Id. at 14:1-9, 15:6-25.) Marla recalls specifically being told that their property would be insured up to some amount per pound. (Id. at 19:3-12.). At some point, Defendant advised Marla that Plaintiffs could purchase additional insurance for their items. (Id. at 15:6-23:4, 72:25-76:17.) Defendant also appears to have faxed Marla forms that related to purchasing additional coverage. (Id. at 22:23-25, 75:5-11; see also id. at 74:5-10.) Although the record is not entirely clear, it appears Defendant advised Marla of the possibility of purchasing insurance at some time before the move occurred. (Id. at 16:3-17:17 (stating that Defendant provided Marla with information about the possibility of insurance at the time Defendant was providing an estimate of the cost of the move), 74:5-75:23 (stating that Defendant provided Marla with documents discussing the insurance option "in the original papers that went back and forth when [Plaintiffs] were deciding to use [Defendant].").) Marla also testified, however, that she requested additional information about selecting a higher level of insurance coverage but Defendant's agent failed to provide the information. (Id. at 75:15-23.)

Although Saadia appears to have played a more limited role in arranging the logistics of the move at issue, Saadia was present when Defendant removed the Shapiros' personal property from their Brooklyn home. (Saadia Dep. at 13:11-14:9.) Marla was not present at the home at this time. (Marla Dep. at 24:3-14.) Saadia recalls having conversations with Defendant's foreman at this time. First, after a substantial amount of the Shapiros' property had already been moved, Saadia explained to the foreman that the piano, which had not been moved, was of great value, possibly including stating that it was worth $70,000. (Saadia Dep. at 17:22-19:3, 46:15-48:14.) At that time or another time, Saadia may also have mentioned other valuable items, such as antique chairs and a table. (Id. at 48:4-17.) When Saadia mentioned the piano, Defendant's

3

foreman told Saadia, "Don't worry, we do this all the time." and "As long as we list it, it's covered." (Id. at 14:22-15:16.)

After Defendant had moved most or all of Plaintiffs' property out of the Brooklyn home, Saadia had a second conversation with the foreman on the sidewalk in front of the house. (Id. at 41:4-21, 45:8-46:11.) It appears that, during the second conversation, Saadia signed a bill of lading containing a limitation of liability provision. (Id.) The bill of lading is dated December 19, 2004 and states as follows: "The agreed or declared value of the property is hereby specifically stated by the customer (shipper) and confirmed by their signature hereon to be not exceeding 60 [ ] cents per pound per article unless specifically excepted." (Bendavit Aff. Exh. A.) Saadia has testified that Defendant never informed him about the option of purchasing additional insurance:

> Q:    Did you speak to the foreman about insurance?
>
> A:    I didn't know you needed any type of insurance. I assumed everything was insured based on the value.

(Saadia Dep. at 44:6-10.) Similarly, Saadia has no recollection of discussing the possibility of purchasing additional insurance with his wife.[3] (Id. 44:11-45:7.) In contrast, Saadia testified at his deposition that Defendant's foreman assured him the goods were insured based upon their value:

> Q:    You told somebody there, who you believed to be was the foreman, that you had valuable items?

---

[3] In contrast to Saadia's recollection, Marla recalls discussing with Saadia limitations on liability under the terms of the shipping agreement with Defendant and the possibility of purchasing insurance. (Marla Dep. 26:9-27:9.) It is not clear when this discussion occurred. (See id.)

4

A:     I know he was the foreman. He represented himself as the foreman.

Q:     But you don't know his name?

A:     No.

Q:     You didn't get him to sign anything about what he said to you; did you?

. . . .

A:     . . . . He had forgotten to do something with stickers or labels having to do with listing the items in the house.

        Then he said to me, "Don't worry, I'll make it on a separate list."

        I said, "Okay," because I didn't know whether, good or bad, one way or the other, that that was acceptable.

        I don't recall, whether he signed that list or I signed that list, but I do recall seeing the list and I think that was the list that he prepared in his handwriting. So I guess he signed it. I am not sure.

Q:     On this list, did you declare any values to any of the items to your recollection?

A:     I don't remember.

Q:     As you said you don't remember declaring any values?

A:     I don't remember. I do remember clearly pointing out to him certain items of value.

Q:     When you say items of value, did you tell him how much of value?

A:     Yes.

Q:     You did?

A:     Oh, yes.

Q:     How much did you say it was worth?

A:      I told him that the piano was a $70,000.00 piano and I don't remember if I said anything about the antique chairs and table.

Q:      But you remember saying you had a $70,000.00 piano?

A:      I think so. It sounds like something I would have said. You know, I am not certain, but it sounds like something I would have said.

Q:      Well, as you sit here now you are not sure you said that?

A:      I seem to recall, but I am not a hundred percent certain. I do know telling him, boasting to him about what we know that the piano can be bought new, something like that. So that's why I think I did tell him $70,000.00.

(Saadia Dep. at 16:12-19:3.)

Marla Shapiro signed another bill of lading dated May 21, 2005. (Bendavid Aff. Exh. B.) The May 21 bill of lading contained the same limitation of liability provision that was contained in the December 19 bill of lading signed by Saadia: "The agreed or declared value of the property is hereby specifically stated by the customer (shipper) and confirmed by their signature hereon to be not exceeding 60 [ ] cents per pound per article unless specifically excepted." (Bendavid Aff. Exh. B.) At her deposition, Marla testified that she signed the bill of lading after the goods were delivered to Plaintiffs in Englewood, New Jersey. (Marla Dep. at 56:19-60:19 ("You know, they handed me these documents when they were rushing out the door, when the delivery was over in the evening and we were all very tired.").) The May 21 bill of lading—unlike the December 19 bill of lading—contains a signed acknowledgment that the goods had been delivered.

In May 2005, Plaintiffs' items arrived at their New Jersey home in damaged condition.

6

(Pl. Cert. ¶ 6.) These items included "a 1935 Louis XV Model Steinway piano, a vanity mirror, two antique chairs, a Thermador Gatson electric oven, and an armoire." (Pl. Cert ¶ 5; Marla Dep. at 35.) Plaintiffs claim that the veneer on the piano was chipped, the vanity mirror was broken, one antique chair was missing, the oven was damaged, and the armoire was missing its handles. (Pl. Cert. ¶ 5; Saadia Dep. at 7:11-9:11.)

Plaintiffs maintain that they contacted Defendant on several occasions but were not offered a satisfactory resolution. (Pl. Cert ¶ 7.) Plaintiffs then filed this action against Defendant in New York state court. (Id.) Defendant removed the action to this court on October 28, 2005. (Id. ¶ 8.)

## II.     Discussion

### A.     Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "A fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz, 258 F.3d at 69 (citations and quotation marks omitted).

The moving party bears the burden of establishing the absence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). If the moving party has met this burden, then the non-moving party has the burden of "set[ting] forth specific facts

7

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant cannot

escape summary judgment merely by vaguely asserting the existence of some unspecified

disputed material facts, or defeat the motion through mere speculation or conjecture." W. World

Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations

omitted); see also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmovant

can create a genuine issue of material fact only by citing competent, admissible evidence.

Glasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004)

(citing Sarno v. Douglas Elliman-Gibbons & Ives, 183 F.3d 155, 160 (2d Cir. 1999)).

### B. Interstate Carrier Liability under the Carmack Amendment

Plaintiffs' goods were shipped from New York to New Jersey and, as a result,

Defendant's liability is governed by the Carmack Amendment to the Interstate Commerce Act,

which preempts Plaintiffs' state and common law claims. See 49 U.S.C. § 14706; Cleveland v.

Beltman North Am. Co., 30 F.3d 373, 378 (2d Cir. 1994) ("[T]he Carmack Amendment

preempts state common law remedies that might be asserted against a carrier for damages to

goods shipped under a proper bill of lading.") Under the Carmack Amendment, interstate

carriers of household goods may limit their liability "to a value established by written

declaration of the shipper or by a written agreement." 49 U.S.C. § 14706(f)(1).

Although the Second Circuit does not appear to have addressed the issue, other courts

have consistently held that a carrier of household goods seeking to limit liability under the

Carmack Amendment must (1) maintain a tariff in compliance with Interstate Commerce

Commission requirements, (2) give the shipper a reasonable opportunity to choose between two

or more levels of liability, (3) obtain the shipper's agreement as to his or her choice of carrier

8

liability limit, and (4) issue a bill of lading prior to moving the shipment that reflects any such agreement. See Hughes Aircraft Co. v. North Am. Van Lines, Inc., 970 F.2d 609, 611-12 (9th Cir. 1992) (hereinafter, "North Am. Van Lines"); accord Carmana Designs Ltd. v. North American Van Lines Inc., 943 F.2d 316, 319 (3d Cir. 1991); Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1415 (7th Cir. 1987) (hereinafter, "United Van Lines"); Travelers Indemnity Co. of Illinois v. Schneider Specialized Carriers, Inc., No. 04 Civ. 5307 (RJH), 2005 WL 351106, at *5 n.4 (S.D.N.Y. Feb. 10, 2005); see also Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc., 331 F.3d 834, 838-39, 841 (11th Cir. 2003) (same and explaining that the Trucking Industry Regulatory Reform Act of 1994 eliminated the requirement that non-household goods carriers file tariffs with the Interstate Commerce Commission). The carrier bears the burden of proving that it has validly limited its liability. Carmana Designs, 943 F.2d at 319; North Am. Van Lines, 970 F.2d at 612. Defendant in no way challenges the proposition that it is required to establish these four elements in order to successfully assert a contractual limitation on liability defense.

Further, the Second Circuit cases addressing the issue are generally consistent with this four-pronged test. See, e.g., Mech. Tech. Inc. v. Ryder Truck Lines, Inc., 766 F.2d 1085, 1088 (2d Cir. 1985) (finding a bill of lading liability limitation enforceable only after concluding that the shipper had a "'fair opportunity to chose between higher and lower liability by paying a correspondingly greater or lesser charge[.]'") (quoting New York, New Haven & Hartford R.R. v. Nothnagle, 346 U.S. 128, 135 (1953)); Caten v. Salt City Movers & Storage Co., 149 F.2d 428, (2d Cir. 1945) ("Any attempt to limit liability [under the Carmack Amendment] is prohibited except upon a declaration of value by the shipper in writing or upon a released value agreed to in writing.").

Defendant claims that the signed bills of lading successfully limits its liability to 60 cents per pound. Defendant does not argue that any oral agreement or other written agreement to limit liability existed. As a result, each of the two signed bills of lading will be considered in reverse chronological order.

### 1. May 21, 2005 Bill of Lading

It appears to be undisputed that Marla agreed to the May 21, 2005 bill of lading after Defendants had completed the delivery to Plaintiffs' New Jersey home. Marla testified that, "they handed me these documents when they were rushing out the door, when the delivery was over in the evening and we were all very tired." (Marla Dep. at 56:19-60:19.) As discussed above, the cases appear to be unanimous in finding that, in order to effect a limitation of liability, the carrier must "issue a bill of lading *prior to moving* the shipment that reflects any such agreement" to limit liability. See, e.g. North Am. Van Lines, 970 F.2d at 6112 (emphasis added). In the least, there is a material question of fact as to whether the May 21 bill of lading was issued after the move was complete. As a result, Defendant's motion for summary judgment on the basis of the May 21 bill of lading must be denied.

### 2. December 19 Bill of Lading

#### (a) *Reasonable Opportunity to Select a Level of Coverage*

Plaintiffs' primary argument in opposition to Defendant's motion for summary judgment is that Defendant failed to adequately offer them the option of purchasing insurance above the sixty cents per pound liability ceiling. (See Plaintiff's Memorandum of Law in Opposition to the Motion for Summary Judgment ("Pl. Opp.") at 2-5.)

The precise contours of the requirement that a carrier provide the shipper with a

reasonable or fair opportunity for the shipper to select between at least two levels of coverage in order to effectively limit its liability are not entirely clear. In <u>New York, N.H. & Hartford R. Co. v. Nothnagle</u>, 346 U.S. 128 (1953), the Supreme Court found that a railroad had failed to limit its liability for the loss of a suitcase where the shipper of the suitcase did not have actual knowledge of the tariff provision limiting liability. In doing so, the Supreme Court explained that shippers must be given an opportunity to select between at least two levels of coverage in order for a liability limitation to be effective:

> But only by granting its customers a *fair opportunity* to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained. Binding respondent by a limitation which she had no reasonable opportunity to discover would effectively deprive her of the requisite choice; such an arrangement would amount to a forbidden attempt to exonerate a carrier from the consequences of its own negligent acts.

<u>Id.</u> (emphasis added).

In the wake of <u>Nothnagle</u>, there has been some confusion as to this "fair opportunity" requirement. <u>See</u> <u>Hollingsworth & Vose Company v. A-P-A Transp. Corp.</u>, 158 F.3d 617, 620 (1st Cir. 1998) ("The problem is that the circuit courts have not been able to agree on any single, bright-line test for what is a 'fair opportunity.'") The confusion results in large part because the requirement is inherently inconsistent with the contract law theory that underpins the Carmack Amendment and the case law interpreting it. <u>See id.</u> Generally, the shipper's right to purchase additional insurance (as well as the process for selecting such insurance) is spelled out in the carrier's tariff. <u>See, e.g. id.</u> at 619; <u>Mechanical Tech. Inc. v. Ryder Truck Lines, Inc.</u>, 776 F.2d 1085, 1086 (2d Cir. 1985). A shipper is generally charged with knowledge of the information

11

contained in the tariff irrespective of whether the shipper has actually seen the tariff. See American Ry. Express Co. v. Daniel, 269 U.S. 40, 41-42 (1925) (Holmes, J.); Mechanical Tech., 776 F.2d at 108 (in context of experienced commercial shipper, "we believe it is especially appropriate to charge [shipper] with knowledge of a tariff specifically tailored to shipment of computer goods."). As a result, it is unclear why a carrier is required to provide a "reasonable" or "fair" opportunity to purchase a level of coverage when the shipper is charged with knowledge of a document that describes the opportunity to provide coverage. As the First Circuit explained, the confusion surrounding the "fair opportunity" requirement "may be due to a resistance, in the face of the 'fair opportunity' language, to the ordinary law of contracts and tariffs that makes a party pretty much responsible for whatever he or she signs and charges the shipper with knowledge of filed tariffs." Holingsworth, 158 F.3d at 620.

Despite this theoretical complication, numerous courts have used similar or identical language in defining a "fair" or "reasonable" opportunity: "A reasonable opportunity to choose between different levels of coverage 'means that the shipper had both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice.'" Carmana Designs, 943 F.2d at 320 (3d Cir.) (quoting Bio•Lab, Inc. v. Pony Express Courier Corp., 911 F.2d 1580, 1582 (11th Cir. 1990)); accord North Am. Van Lines, 970 F.2d at 612 (9th Cir); United Van Lines, 829 F.2d 1419 (7th Cir.). The agreement must evidence an 'absolute, deliberate and well-informed choice by the shipper." North Am. Van Lines, 970 F.2d at 612 (internal quotations omitted).

The First Circuit, however, has been sharply critical of the broad reading of the "reasonable opportunity" requirement that such language implies:

Th[e] "fair opportunity" language [in New York, New Haven & Hartford R.R. v. Nothnagle, 346 U.S. 128 (1953)], which was in some measure surplus, has taken on a life of its own, and later circuit cases have treated the rubric almost as if it were an independent requirement of the Carmack Amendment. [Footnote citation to cases in the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits omitted.] What has developed is a continuing controversy about how to decide whether there has been such a "fair opportunity."

Hollingsworth, 158 F.3d at 620. Ultimately, the First Circuit decided to read the "reasonable opportunity" requirement fairly narrowly: "It is enough that the tariff made both coverages available, the bill of lading afforded the shipper a reasonable opportunity to choose between them . . . and the shipper was a substantial commercial enterprise capable of understanding the agreements it signed. In our view, that is normally enough to give this shipper a 'fair opportunity' to opt for more coverage in exchange for a higher rate." Id. at 621.

The Second Circuit's approach has been similar to that of the First Circuit. In Caten v. Salt City Movers & Storage Co., 149 F.2d 428 (2d Cir. 1945), the Second Circuit made clear that a carrier must give the shipper an opportunity to purchase insurance in order to effectively limit the carrier's liability: "Only by giving the shipper an opportunity to choose between higher and lower rates based upon valuation can the carrier place the shipper who has selected a lower rate in the prescribed manner in the position where he is estopped to assert loss or damage to an amount in excess of the declared valuation upon which the rate was fixed." Id. at 432.

More recently, the Second Circuit has found that, in some cases, constructive knowledge of alternative levels of coverage is sufficient. In Mechanical Technology Inc. v. Ryder Truck Lines, Inc., 776 F.2d 1085 (2d Cir. 1985), a sophisticated commercial shipper of computer goods that had been specifically warned that the carrier did not utilize the specialized equipment

needed to safely transport the computer goods was charged with knowledge of different levels of coverage described in the carrier's tariff even though the carrier had not provided the shipper with actual notice of the different levels of coverage. Id. at 1087-88. The court concluded that "[t]he various rates listed in [carrier's] tariff provided [shipper] with a 'fair opportunity to choose between higher and lower liability by paying a correspondingly greater or lesser charge. . . .'" Id. at 1088 (quoting Nothnagle, 346 U.S. at 135).

The language of the Mechanical Technology opinion, Judge Winter's concurrence in Mechanical Technology, and at least two subsequent decisions all indicate that Mechanical Technology was a fact-specific decision that did not set forth a bright-line rule that the shipper has a reasonable opportunity to purchase a higher level of coverage whenever the tariff specifies multiple levels of coverage. See Mechanical Technology, 776 F.2d at 1089 ("*When a sophisticated shipper, using his own bill of lading form, leaves blank the space provided for declaring the released value of the goods*, we will presume that he did so deliberately with full knowledge of the consequences under the applicable tariff.") (emphasis added); id. at 1090 (Winter, J., concurring in the judgment) ("The new rule requires that the trier of fact take the sophistication of the commercial shipper and the original of the particular bill of lading into account."); Hollingsworth, 158 F.3d at at 621 ("The panel majorit[y] in the Mechanical . . . decision[] can be taken to have decided the matter on specific facts (e.g. how sophisticated was the shipper, who prepared the bill of lading, etc.)."); Asset Mgmt. & Contorl, Inc. v. ABF Freight Sys., Inc., 18 F. Supp. 2d 187, 192 (N.D.N.Y. 1998) (Mechanical Technology "merely found that such agreement could be presumed where: (1) the carrier's lawfully filed tariff contained an applicable inadvertence clause, (2) the circumstances justify holding the shipper to have been

14

constructively aware of the terms of the tariff or actually aware of those terms, (3) a space was provided on the bill of lading to request a released rate other than the default rate in the inadvertence clause, and (4) the shipper [left] blank the space provided for declaring the released value of the goods") (internal quotation marks omitted).

In this case, the issue of whether Plaintiffs were presented a reasonable opportunity to select between at least two levels of coverage is particularly complex and has not been adequately addressed in the parties' briefing. First, the parties have failed to brief the issue of whether (1) Saadia and Marla both had to have an adequate opportunity to purchase additional insurance or (2) it is sufficient for only one of them to have had the opportunity.[4] If the latter, the parties have failed to brief the issue of which of the two Plaintiffs must have had the opportunity to purchase insurance in order for there to be an effective limitation of liability.

Despite the lack of briefing on the issue, it appears clear that Defendant's liability would be limited if Saadia had a reasonable opportunity to purchase additional insurance because Saadia was the one who signed the December 19 bill of lading. In doing so, Saadia held himself

---

[4] Two factual points warrant mention. First, in the parties' Rule 56.1 Statements, they state that "Plaintiffs, Marla Shapiro and Saadia Shapiro hired Prime Moving & Storage, Inc. to pack, transport and store their goods[.]" (Def. Rule 56.1 Statement ¶ 2; Pl. Rule 56.1 St. ¶ 2.) Assuming this statement is true for purposes of this motion, even if both Plaintiffs retained Defendant to move their goods, this in no way suggests that both Plaintiffs agreed to the liability limitation provision included in the December 19 bill of lading. Second, Plaintiffs' counsel, Charles Mester, has submitted a Certification in Opposition to Defendant's Motion for Summary Judgment, which states that "Marla Shapiro entered into an order for service dated December 19, 2004. The order for service lists $.60/pound/article as the value of the goods being shipped." (Mester Aff. ¶ 4.) This "Certification" is clearly intended as a statement of the factual issues relevant to this motion as opposed to an affidavit based on personal knowledge. The Certification states that the order for service is annexed at Exhibit A. (Id.) The order for service annexed at Exhibit A is dated May 21, 2005. As a result, the record does not appear to contain a written pre-move limitation of liability signed by Marla Shapiro.

out as being authorized to sign the bill of lading. Further, Plaintiffs do not argue that Saadia lacked the authority to sign the bill of lading.

It is less clear whether there would be an effective limitation of liability if Marla was given a reasonable opportunity to select different levels of coverage. There are a number of potential theories which might yield an affirmative answer to this question. First, because Marla appears to have been primarily responsible for negotiating with Defendant, Marla arguably retained Defendant and Saadia was merely acting as Marla's agent when he oversaw Defendant's actual physical move of Plaintiffs' possessions out of Plaintiffs' Brooklyn home. The December 19 bill of lading offers support for this theory because it identifies "Ms. Shapiro" as the principal. (Bendavit Aff. Exh. A.) Second, one might be able to argue that Saadia was the principal and Marla was merely acting as Saadia's agent by making the preliminary arrangements with Defendant. Third, it is possible that Plaintiffs jointly retained Defendant to move commonly held property and, in doing so, each is the agent of the other. Although the parties have not cited any evidence that supports this proposition, it is consistent with the parties' Rule 56.1 Statements, which provide that "[o]n or about December 19, 2004, Plaintiffs, Marla Shapiro and Saadia Shapiro[,] hired Prime Moving & Storage, Inc. to pack, transport and store goods. . . ." (Def. Rule 56.1 Statement ¶ 2; Pl. Rule 56.1 St. ¶ 2.) In light of the fact that these agency law questions have not been addressed by either party, the court will not consider them at this time. Instead, the court will consider only whether Saadia had a reasonable opportunity to select between at least two levels of coverage.

Saadia is not the type of sophisticated commercial actor that should be charged with knowledge of information (including the option to select different levels of coverage) contained

in the tariff as a matter of law. See Mecanical Technology, 776 F.2d at 1088-89. Defendant has not pointed to any evidence that Saadia, like the commercial shipper in Mechanical Technology, regularly shipped goods pursuant to a bill of lading or otherwise had any understanding of bills of lading or tariffs. Instead, Defendant points to the fact that Saadia is a practicing attorney. (Def. Mem. At 2 ("Plaintiffs, who are attorneys themselves and thereby sophisticated with contract law. . . .")) Attorneys practice in a large variety of complex and increasingly specialized fields of law, and, unlike commercial shippers, do not necessarily understand that tariffs contain some of the terms of shipping contracts. Although the fact that Saadia is a practicing attorney is a fact which may be relevant to determining whether Plaintiff had a reasonable opportunity to select a level of coverage at trial, it is not sufficient to establish on summary judgment that Plaintiff had a reasonable opportunity as a matter of law.

Viewing the evidence in the light most favorable to the Plaintiffs, Defendant never provided Saadia with actual notice of his right to select different levels of coverage. In fact, the information Defendant provided to Saadia concerning insurance options was, at best, misleading and, at worst, an intentional misrepresentation. Saadia specifically raised the issue of the high value of at least some of the property that was ultimately damaged with Defendant. (Saadia Dep. at 17:22-19:3, 46:15-48:17.) When Saadia mentioned the piano, Defendant's foreman told Saadia "Don't worry, we do this all the time." and "As long as we list it it's covered."[5] (Id. at

---

[5] There may be a question as to whether the parol evidence rule prevents this court from considering oral statements extrinsic to the bill of lading, including the foreman's alleged statement that Plaintiffs were "covered" so long as the valuable items were included on a list. In construing bills of lading, courts do appear to apply the parol evidence rule. See Kansas City Southern Railway Co. v. Carl, 227 U.S. 639, 652 (1913) ("The valuation declared or agreed upon as evidenced by the contract of shipment upon which the published tariff rate is applied must be

14:22-15:16.)

Although it is not entirely clear what Defendant's foreman meant by "list[ing]" items, it is entirely possible that Saadia took the statement to mean that as long as the valuable items were included on an inventory list, they were insured for their full value. In his deposition testimony, Saadia makes reference to Defendant's foreman preparing some type of inventory list. (Saadia Dep. at 17:4-17.) Similarly, attached to the Complaint is a list dated December 19, 2004 which appears to inventory many, if not all, of the items Defendant moved for Plaintiffs.[6] (Compl.

---

conclusive in an action to recover for loss or damage [of] a greater sum. . . . To permit such a declared valuation to be overthrown by evidence *aliunde* [to] the contract, for the purpose of enabling the shipper to obtain a recovery in a suit for loss or damage in excess of the maximum valuation thus fixed, would both encourage and reward undervaluations and bring about preference and discriminations forbidden by the law."); Thomas v. Trans World Airlines, Inc., 457 F.2d 1053, 1056 (3d Cir. 1972) ("As a general rule, a shipper is conclusively bound by tariff rules of a carrier and parol evidence cannot be received to vary the terms thereof."); Walters v. DHL Express, No. 05-cv-1255, 2007 WL 1431869, at *4 (C.D. Ill. May 14, 2007) (parol evidence rule precluded consideration of extrinsic documents in interpreting waybill governed by Carmack Amendment); Tech. Prospects LLC v. Atlas Van Lines, Inc., No. 06-c-0174, 2006 WL 2591296, at *3 (E.D. Wis. Aug. 10, 2006) (parol evidence rule governs construction of bills of lading, but permitted consideration of extrinsic evidence that language contained in bill of lading was a mutual mistake); Atwood v. UW Freight Line, Inc., 127 F. Supp. 2d 1155, 1162-63 (D. Idaho 1999) (report and recommendation refusing to consider parol evidence in construing a bill of lading). The court will consider these statements at this time for two reasons. First, Plaintiffs cited to these statements in their Certification in Opposition and Defendant did not assert in its Reply Brief that these statements were inadmissible. Second, in this opinion, the court is not considering these statements for the purpose of construing the bill of lading; instead, at this time, the court is considering these statements for the limited purpose of determining whether Plaintiffs had a reasonable opportunity to select between two levels of coverage.

[6] Although no party has raised the issue, it appears that this list has been submitted only as an attachment to the Complaint and not as a "[s]worn or certified copy" of document "referred to in an affidavit." Rule 56(e). As a result, it would appear that Rule 56(e) precludes the court from considering the list at this time. The court refers to the list here only for the purpose of completeness; the court does not rely upon the list attached to the Complaint in ruling on this motion.

Group Exh. A.) Irrespective of whether the list attached to the Complaint is the list to which Defendant's foreman was referring, Saadia has testified that, in the context of the foreman's assertion that information that is listed is "covered," Defendant's foreman specifically stated, "Don't worry, I'll make it on a separate list."

Again, taking the facts in the light most favorable to Plaintiffs, it appears that Defendant's foreman specifically advised Saadia that (1) all of the items identified on the list were covered and (2) Saadia should not worry because the foreman was including the valuable items on a separate list. In this way, this case is easily distinguishable from Mechanical Technology, in which the shipper was an "experienced shipper" that had been specifically warned that damages might result from hiring the carrier to transport specialized and delicate computer goods. Mechanical Tech., 776 F.2d at 1088. Here the actor is not an experienced commercial shipper and was specifically told that his goods were insured.

Instead, this case is far closer to those cases in which courts held that a shipper does not have a reasonable opportunity to select between different levels of coverage (or, in the least, that there was a material question of fact as to whether shipper had a reasonable opportunity) when the carrier misled or deceived the shipper. See Carmana Designs, 943 F.2d at 320-21 (shipper did not have reasonable opportunity to select level of coverage where carrier misled shipper by stating on bill of lading that (1) coverage was for $1.25 per pound of actual weight and (2) the net weight of the shipment was 24,000 pounds (rather than actual weight of 9,275 pounds)); Chandler v. Aero Mayflower Transit Co., 374 F.2d 129, 136-37 (4th Cir. 1967) (on remand, district court should consider whether shipper had reasonable opportunity to select level of coverage where carrier misled shipper by telling him that he was signing inventory sheets as

opposed to bill of lading). Cf. Technical Prospects LLC v. Atlas Van Lines, Inc., No. 06-C-0174, 2006 WL 2591296, at *3 (E.D. Wis. Aug. 10, 2006) ("Materially changing the terms of the parties' agreement [providing for a high-level of insurance coverage] by instructing the shippers agent to sign a bill of lading [providing for a low-level of insurance coverage] after the shipment is loaded without explaining the significance of the change can hardly be considered a reasonable opportunity to choose between different levels of liability."). As a result, I find that there is a material question of fact as to whether Plaintiffs had a reasonable opportunity to select between at least two levels of insurance coverage.

The court is cognizant of the problematic implications of denying Defendant's summary judgment motion. Above all else, by considering extrinsic evidence to determine whether the "reasonable opportunity" requirement has been satisfied means that bills of lading issued to non-commercial shippers are subject to collateral attack by the shipper, who needs nothing more than his own testimony to survive summary judgment. Even with a relatively clear bill of lading, a carrier may have to go through the expense of federal court litigation—including a trial—in order to establish that its liability was effectively limited in a bill of lading. In a case such as this, where agency issues are presented, the expense of litigation only increases, despite the fact that the parties appear to agree that this is only a $30,000 dispute. However, given the current state of the case law on the subject, until the Second Circuit or the Supreme Court narrows or eliminates the "reasonable opportunity" requirement, carriers may often have to endure litigation expenses that consume most of their benefit of the liability limitation bargain. In the interim, a carrier would be well advised to have a shipper sign a statement that (1) explains the different coverage options (including available coverage options and corresponding prices) and (2)

specifically requires the shipper to select a level of coverage. Such a statement should be signed by the same person who signs or otherwise receives the bill of lading and should be signed at the time the bill of lading is issued, at some time prior to the move.

### (b)     *Existence of an Agreement to Limit Liability*

Although the parties have not briefed the question of whether there was an agreement to limit liability, the court will touch upon this issue in the hope that addressing it now will assist the parties in disposing of the instant litigation. There are numerous cases in which courts have held that a carrier effectively limits its liability when (1) the tariff states that carrier's liability is limited to a specified amount unless the shipper specifically opts for a higher level of carrier by specifying as such on the bill of lading, (2) the carrier includes a specific space on the bill of lading for the shipper to set forth its selection of a level of coverage that is higher than the minimum identified in the tariff, and (3) the shipper signs the bill of lading without making any indication on the bill of lading that it wishes to select a higher level of coverage. E.g., Hollingsworth, 158 F.3d at 619-21; Mechanical Technology, 776 F.2d at 1085-89.

In this case, neither party has submitted the applicable tariff. As a result, there appear to be at least two potential bases for distinguishing the instant case from those cases which find that a blank space in the insurance coverage section of a bill of lading constitutes an agreement to limit liability. First, the tariff may not require the shipper to have selected a higher level of coverage by specifying as such on the bill of lading. If this is the case, Plaintiffs may be able to argue that the inventory list constituted an agreement for a higher level of coverage. Second, even if the tariff does require that the shipper's decision to select a higher level of coverage on the bill of lading, the Plaintiffs may be able to argue that the inventory list constituted part of or

21

an attachment to the bill of lading within the meaning of the tariff's definition of the bill of lading.

Because the issue has not been briefed, the court does not, at this time, reach any conclusions as to whether the parties reached an agreement to limit the carrier's liability. Nothing in this decision precludes either party from taking any position on this issue for the remainder of this litigation.

## III.    Conclusion

For the reasons set forth above, Defendant's motion for summary judgment is denied in its entirety. The parties advised the court that, in the event the instant motion was denied, the parties will arbitrate the dispute. (See 3/31/06 Minute Entry for Status Conference Before Magistrate Judge Marilyn D. Go.) As a result, this case is referred to arbitration and the Clerk of the Court is directed to close this case. Either party may ask the court to re-open the case in the event that it becomes necessary to do so.

SO ORDERED.

Dated: August 31, 2007
Brooklyn, N.Y.

/signed/

NICHOLAS G. GARAUFIS
United States District Judge